**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | | |
|---|---|---|
| CLARETTA C. GREEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 2:18-cv-00788-DCN |
| vs. | ) | |
| | ) | **ORDER** |
| ROBERT WILKIE, *Secretary of Veterans Affairs*, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

The following matter is before the court on United States Magistrate Judge Kevin F. McDonald's ("Magistrate") report and recommendation ("R&R"), ECF No. 86, that recommends the court deny plaintiff Claretta C. Green's ("Green") amended motion for partial summary judgment, ECF No. 65 and grant defendant Robert Wilkie's ("defendant") motion for summary judgment, ECF No. 66. For the reasons set forth below, the court adopts the R&R, denies Green's amended motion for partial summary judgment and grants defendant's motion for summary judgment.

## I.  BACKGROUND

### A.  Factual Background[1]

This case arises out of alleged race and sex and/or gender discrimination, in violation of Title VII of the 1964 Civil Rights Act (42 § U.S.C. 2000, et seq.), and the 1991 Civil Rights Act, as amended, by defendant's agents and/or servants while

---

[1] Green specifically objects to portions of the factual background of the R&R. ECF No. 89 at 4, 7, 10–12, 14, 16, 18, 22–23, 25, 28. The portions of the factual background the court cites from the R&R in this order are not objected to by Green. Therefore, the court treats Green's lack of objections to those facts as her agreement with the R&R's able recitation of those facts. See Thomas v. Arn, 474 U.S. 140, 150 (1985).

1  employed by Ralph H. Johnson VA Medical Center ("VAMC") in Charleston, South

2  Carolina.  ECF No. 7 at 11–12, 14–15.  On September 11, 2014, a patient at VAMC who

3  had a retinal detachment, underwent a vitrectomy performed by Wade Reardon, M.D.

4  (resident) and R. Griffin Brame, Jr. M.D. (attending physician), both of whom are

5  Caucasian males.  ECF No. 86 at 1.  The surgery relied on a perfluoropropane gas

6  ("C3F8 gas") infusion into the eye to flatten out the retina so that the physician had room

7  to make the repair.  Id. at 2.  Dr. Brame stated that the "gas air mixture was placed at the

8  end of the surgery and is drawn up directly from the vitrectomy machine.  The computer

9  monitor on the machine was set at 14% gas air mixture, which was placed into a large

10  syringe and was then infused into the eye."  ECF No. 66-4.  Green, who is an African-

11  American female, was the circulating nurse for the surgery performed on September 11,

12  2014, and Abigail Prioleau, LPN 6, an African-American female, served as scrub nurse.

13  ECF No. 86 at 2.  The VAMC held an Institutional Disclosure of the Adverse Event on

14  September 29, 2014, which notified the patient "that an error resulted in pure CO2 gas

15  rather than a mix of CO2 and air being injected into his eye for a retinal detachment

16  repair.  This subsequently cause[d] high pressure in the eye that damaged the retinal

17  nerve resulting in visual loss."  ECF No. 66-19 at 2.

18         On March 9, 2015, the patient filed an administrative tort claim alleging

19  negligence and seeking $300,000 in damages.  ECF No. 86 at 3.  The Department of

20  Veteran Affairs' ("VA") Office of Medical-Legal Affairs ("OMLA") was notified of the

21  tort claim.  Id.  The Veterans Health Administration ("VHA") Handbook 1100.17,

22  National Practitioner Data Bank Reports, directs the OMLA's review procedures.  Id.

23  The handbook was seen to "guide the protocol for reporting to the National Practitioner

1    Data Bank." ECF No. 66-8. The handbook provides that the VAMC must identify all

2    practitioners involved in the episode that led to the claim and provide written notification

3    to all involved practitioners within 30 days of notification by Regional Counsel that a

4    claim has been filed." ECF No. 66-9 at 7. The claim was denied by Regional Counsel,

5    and Green admits that she was appropriately notified of the denial by hand-delivered

6    memorandum dated September 29, 2015 ("Pre-Payment Letter"). ECF No. 65-1 at 6

7    (citing ECF No. 65-21). On November 3, 2015, the patient filed a complaint in the

8    United States District Court for the District of South Carolina. ECF No. 86 at 4. The

9    lawsuit settled on December 15, 2015, for $300,000, which the defendant paid to the

10   patient on December 30, 2015 ("Patient Settlement"). ECF No. 65-3 at 3.

11          When a claim has been paid, the VHA Handbook 1100.17 provides that "[t]he

12   Medical Center Director is responsible for notifying all involved practitioners of the

13   opportunity to provide a written statement concerning the care that led to the claim for

14   consideration by the Review Panel." ECF No. 66-9 at 5. The provision further states,

15   "For each involved practitioner, the Medical Center Director's notification must be in

16   writing and hand-delivered or sent to the practitioner's current verified business or home

17   address." Id. at 7. The notification must state that the VA is considering whether to

18   report the practitioner to the National Practitioner Data Bank ("NPDB") because of a

19   specified malpractice payment, and reporting to the NPDB is based on the finding by a

20   Review Panel that there was substandard care, professional incompetence, or professional

21   misconduct during an episode of care. Id. at 8. The notification must also state that the

22   practitioner has the opportunity to submit a written statement, that the practitioner is

23   allowed 60 calendar days from receipt of notification to access medical records and

3

1    submit a statement, and that this is the only opportunity to submit information to the

2    Review Panel.  Id.  The VHA Handbook further states that for each involved practitioner

3    not submitting a statement, the Medical Center Director is responsible for documenting

4    that the involved practitioner received notification of the opportunity to submit a written

5    statement and written acknowledgment of receipt from the practitioner must be obtained.

6    Id.  The Code of Federal Regulations includes these same requirements:

7            The practitioner(s) whose actions are under review will receive a written
8            notice, hand-delivered or sent to the practitioner's last known address
9            (return receipt requested), from the VA facility director at the time the VA
10           facility director receives the Notice of Payment.  That notice from the VA
11           facility director will indicate that VA is considering whether to report the
12           practitioner to the National Practitioner Data Bank because of a specified
13           malpractice payment made, and provide the practitioner the opportunity,
14           within 60 days of receipt, to submit a written statement concerning the care
15           that led to the claim. Inability to notify or non-response from the identified
16           practitioner(s) will not preclude completion of the review and reporting
17           process.  The panel, at its discretion, may request additional information
18           from the practitioner or the VA facility where the incident occurred.  The
19           review panel's notification to the VA facility Director shall include the acts
20           or omissions considered, the reporting conclusion, and the rationale for the
21           conclusion.
22
23    38 C.F.R. § 46.3(b).

24           In a letter dated January 25, 2016, Scott R. Isaacks, VAMC Director, wrote the

25    plaintiff notifying her that she had been identified as a participant in the care provided to

26    the patient, which led to a paid medical malpractice claim ("Post-Payment Medical

27    Malpractice Claim Letter").  ECF No. 66-5 at 1–2.  The Post-Payment Medical

28    Malpractice Claim Letter further stated that the OMLA would convene a Review Panel to

29    determine if the standard of care was met and of the possibility of NPDB report if the

30    Review Panel determined there was substandard care, professional incompetence, or

31    professional misconduct.  Id.  Mr. Isaacks advised that attending staff are responsible for

4

1    the actions of trainees under their supervision, that she had the opportunity to present a

2    statement, and that "You and, if you wish, your authorized representative are afforded the

3    opportunity to review the Veteran's medical record at the medical center." Id.  A

4    tracking receipt shows that the Post-Payment Medical Malpractice Claim Letter was

5    delivered to Green's work email account on February 3, 2016. Id. at 3.  On March 8,

6    2016, Susan McCormack, identified by the Green as Risk Manager, ECF No. 65-1 at 8,

7    emailed Green in reference to the February 3rd email and stated, "[J]ust checking to see if

8    you planned on responding to this.  You still have time but I just wanted to check in with

9    you." ECF No. 66-5 at 4.

10        Mr. Isaacks also sent a letter to Dr. Brame that is exactly the same as the Post-

11    Payment Medical Malpractice Claim Letter sent to Green.  ECF No. 65-29.  Dr. Brame

12    testified in his deposition that he had no recollection of receiving the notification letter

13    from Mr. Isaacks in any manner other than by email.  ECF No. 66-12 at 3–4.

14        On February 29, 2016, John Grippi, M.D., the Director of the OMLA, issued a

15    memorandum that was sent, by email, to VAMC Director Scott R. Isaacks, Quality

16    Manager Melissa Harrelson, and Clinical Risk Manager Sandra All, as well as others,

17    indicating that a Review Panel had been convened for the purpose of determining

18    whether or not substandard care was engaged in by any of the practitioners assigned to

19    provide care to the patient ("February 29, 2016 Memorandum").  ECF No. 65- 6 at 2-5.

20    The February 29, 2016 Memorandum set out the review process and stated that a finding

21    of substandard care by a practitioner assigned to provide care would necessitate that the

22    practitioner who rendered the substandard care be reported to the NPDB.  Id.

1       On November 14, 2016, Dr. Grippi moderated the OMLA Review Panel to

2    review the patient's paid tort claim and determine whether the standard of care was met.

3    Four physicians served on the panel.  ECF No. 86 at 6.  There is no indication that any of

4    the physicians had any prior association with or knowledge of Green.  Id.  The Review

5    Panel unanimously determined that Green provided substandard care to the patient and

6    recommended that a report to the NPDB be made.  ECF No. 66-8 at 28.  During the

7    OMLA review, Cynthia Wcislo, RN, reviewed the patient's medical records of the event

8    at issue and prepared a report as a "fee-basis reviewer," meaning that she was not a

9    permanent part of the OMLA staff but was retained as needed. She concluded as follows:

10           Claretta Green was not named in the Institutional Disclosure of Adverse
11           Event note, but she was the circulating RN for the case and documented in
12           the OR package that medications administered included Perfluron 5 ml and
13           C3F8 gas. This was not correct as evidenced by the patient's problems after
14           surgery. . . I conclude that as outlined in the note of 10/3/14, the operator of
15           the equipment made a mistake and substandard care was given, hence, Ms.
16           Green should be reported to the NPDB.
17
18    ECF No. 66-5 at 29–30.

19           On January 25, 2017, Dr. Grippi notified the VAMC Director that the Review

20    Panel determined that the patient received substandard care and identified Green as the

21    responsible practitioner.  ECF No. 86 at 7.  Specifically, the memorandum stated that "the

22    failure of the Operating Room Nurse (Claretta Green, RN) to properly prepare the

23    mixture of CO2 and air in the correct proportions during the procedure on 12 September

24    2014 breached the standard of care."  ECF No. 66-5 at 22.  Dr. Grippi directed that "[t]he

25    required report should be submitted to the NPDB, and a copy forwarded to this office,

26    within 30 days of receipt of this memorandum.  The NPDB will send a copy of the

27    submitted report to the practitioner with a limited comment period in which to make

1    changes or append comments." Id. By letter dated January 27, 2017, VAMC Director

2    Isaacks notified Green that the Review Panel concluded that the patient received

3    substandard care and identified her as the registered nurse who provided that care. ECF

4    No. 66-7 at 21. Isaacks stated that the panel recommended reporting her to the NPDB,

5    offered to review the panel report with her, and advised that she was allowed a limited

6    comment period in which to make changes or append comments. Id. Green stated that

7    this was the first time she was made aware that she was the subject of a Review Panel

8    investigation regarding the patient's care. ECF No. 83 at 8.

9        On January 30, 2017, Green sent Susan McCormack, Sandra All, and Tressa

10    Stenzel an email asking to speak with them on the following Thursday, February 2nd,

11    which they did. ECF No. 66-14. In an email dated February 2, 2017, Clinical Risk

12    Manager All notified Camille Bratek, an attorney with the OMLA, that the Green had

13    met with her that day and informed Ms. All that she "did not remember ever being

14    notified and would like to provide a written statement." ECF No. 65-9 at 3. Ms. All

15    further noted that Green stated that "it was the scrub tech who has the responsibility for

16    mixing the gases in this case and not the circulator." Id. Ms. All asked if Ms. Bratek

17    "would agree to let her submit something now." Id. at 4. Ms. Bratek responded that the

18    plaintiff could "submit a statement[,] and the case will proceed through our re-review

19    process." Id. at 2.

20        Ms. McCormack sent an email to Ms. Bratek on February 23, 2017, with Green's

21    statement attached. ECF No. 65-9 at 2; ECF No. 66-5 at 32. On February 24, 2017, the

22    VAMC submitted electronically the Medical Malpractice Payment Report concerning

23    Green to the NDPB. ECF No. 86 at 10. After the VAMC submission to the NDPB,

Green requested that the OMLA re-review the allegations.  Id. at 11.  The OMLA agreed

and requested more information from VAMC personnel.  On June 13, 2017, Nurse

Manager Kim Croy provided a statement to the OMLA, stating in pertinent part:

> Ms. Green was the RN circulating nurse in OR 5 for . . . eye procedure.  Ms. Green had detailed training on February 11, 2014, on the Constellation Retinal Machine. . . .
>
> There is also a detailed, step-by-step instruction guide on the side of the Retinal Machine if a question arises on the use of that machine.  She did not verbalize any concerns about her assignment that day.
>
> I was not physically present in the room during that procedure, so I cannot attest to anything that happened during that time.  I was informed of the details after the case concluded.
>
> As the circulating nurse, Ms. Green has the ultimate responsibility as the patient advocate and oversees all activity in the room.  Aside from the attending physician, Ms. Green is in charge of the room to which she is assigned.

ECF No. 66-5 at 31.  On February 1, 2018, Dr. Grippi moderated a second OMLA

Review Panel consisting of two physicians and one nurse.  ECF No. 86 at 11.  The

second OMLA Review Panel voted unanimously that Green provided substandard care.

ECF No. 66-8 at 30.  Id.  On February 9, 2018, the OMLA notified the VAMC of the

Review Panel's re-review conclusion that the Green provided substandard care.  ECF No.

66-17.  Dr. Grippi noted that the Green's statement dated February 13, 2017, was made

available for review by the panel.  Id.  Dr. Grippi stated:

> The panel noted that it is reportedly the responsibility of the OR (Operating Room) nursing staff to mix the gas for the ophthalmologic procedure.  The Eye Surgeon is reportedly handed a syringe with what he assumes to be the correct mixture of $CO_2$ and air; since the mixture is colorless and odorless, there is no way to tell that the mixture was prepared using the correct proportions.  Only when the patient presented with his problems the day after surgery were they able to surmise what had happened in the OR.  The panel noted that the Circulating Nurse for the case (RN Green) documented in the OR package that medication administered included Perfluron 5 ml

1   and C3F8 gas.  However, this was not correct as evidenced by the patient's
2   problems after surgery.
3
4   Id.  The State Board of Nursing for South Carolina initially issued Green a "letter of

5   caution."  ECF No. 86 at 12.  However, after an appeal and hearing, the "letter of

6   caution" was retracted, and the matter was dismissed by the State Board of Nursing for

7   South Carolina on February 11, 2019.  ECF No. 65-11.  Green testified that on December

8   15, 2017, she applied for a Nurse Practitioner's license from the State Board of Nursing

9   after completing her degree, but because she had been reported to the Board as having

10  rendered substandard care to the patient at issue, she was not allowed to secure her

11  license until October 5, 2018.  ECF No. 65-25 at 3–4.  She further testified that she

12  applied for a Nurse Practitioner position with the Elite Patient Care, and she was offered

13  the job informally, but the offer was rescinded when her state licensure was delayed.  Id.

14        As a result, Green filed this instant lawsuit.  In her amended complaint, the

15  plaintiff alleges causes of action for (1) race discrimination in violation of Title VII of the

16  Civil Rights Acts of 1964, as amended; (2) gender and/or sex discrimination in violation

17  of Title VII; (3) hostile work environment; (4) retaliation in violation of the Family and

18  Medical Leave Act ("FMLA"); (5) violation of the right to due process under the Fifth

19  Amendment; (6) disparate treatment because of race in violation of Title VII; and (7)

20  disparate treatment because of sex in violation of Title VII.  ECF No. 7 at 11–15.

21        **B.  Procedural Background**

22        On July 25, 2019, Green filed an amended motion for partial summary judgment,

23  ECF No. 65, and defendant filed motion for summary judgment on July 26, 2019, ECF

24  No. 66.  On August 20, 2019, defendant filed a response to the Green's amended motion

25  for partial summary judgment.  ECF No. 74.  Green filed a response in opposition to

1    defendant's motion for summary judgment on September 9, 2019, ECF No. 83, and the

2    defendant filed a reply on September 13, 2019, ECF No. 85.  On January 16, 2020,

3    United States Magistrate Judge Kevin F. McDonald issued the R&R recommending that

4    the court deny Green's amended motion for partial summary judgment and grant

5    defendant's motion for summary judgment.  ECF No. 86.  On March 2, 2020, Green filed

6    her objections to the R&R, ECF No. 89, to which defendant replied on April 15, 2020,

7    ECF No. 92.  The motion has been fully briefed and is now ripe for the court's review.

8                                    **II.  STANDARD**

9           **A.  Rule 72(b)**

10          This court is charged with conducting a _de novo_ review of any portion of the

11   magistrate judge's report to which specific, written objections are made, and may accept,

12   reject, or modify, in whole or in part, the recommendations contained in that report.  28

13   U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3).  The magistrate judge's recommendation

14   does not carry presumptive weight, and it is the responsibility of this court to make a final

15   determination.  Mathews v. Weber, 423 U.S. 261, 270–71 (1976).  A party's failure to

16   object may be treated as agreement with the conclusions of the magistrate judge.

17   See Thomas, 474 U.S. at 150.  The court may "accept, reject, or modify the

18   recommended disposition; receive further evidence; or return the matter to the magistrate

19   judge with instructions."  Fed. R. Civ. P. 72(b)(3).

20          **B.  Summary Judgment**

21          Summary judgment shall be granted "if the pleadings, the discovery and

22   disclosure materials on file, and any affidavits show that there is no genuine dispute as to

23   any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R.

1    Civ. P. 56(c).  "By its very terms, this standard provides that the mere existence of some

2    alleged factual dispute between the parties will not defeat an otherwise properly

3    supported motion for summary judgment; the requirement is that there be no genuine

4    issue of material fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986).

5    "Only disputes over facts that might affect the outcome of the suit under the governing

6    law will properly preclude the entry of summary judgment."  Id. at 248.  "[S]ummary

7    judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the

8    evidence is such that a reasonable jury could return a verdict for the nonmoving party."

9    Id.  "[A]t the summary judgment stage the judge's function is not himself to weigh the

10    evidence and determine the truth of the matter but to determine whether there is a

11    genuine issue for trial."  Id. at 249.  The court should view the evidence in the light most

12    favorable to the non-moving party and draw all inferences in its favor.  Id. at 255.

13                                   **III.  DISCUSSION**

14           **A.  Counts 3, 4, and 5**

15           Before the court begins its analysis of Green's objections, it addresses the causes

16    of action to which Green did not object.  Green alleged seven causes of action in her

17    amended complaint, but Green failed to object to the R&R's conclusion that the

18    following counts be dismissed: (a) count three—hostile work environment and (b) count

19    four—retaliation in violation of the Family and Medical Leave Act.  ECF No. 86 at 14.

20    Green also failed to object to R&R's conclusion that Green's motion for partial summary

21    judgment should be denied, and defendant's motion for summary judgement be granted

22    as to count five—violation of the right to due process under the Fifth Amendment.  Id. at

23    14–16.  Accordingly, the court treats Green's lack of objections as agreement with those

1    conclusions of the R&R and therefore adopts those portions of the R&R.

2    See Thomas, 474 U.S. at 150.

3    **B.  Green's Objections**

4    Green has raised 32 specific objections to the R&R.  ECF No. 89 at 4, 7, 10–12,

5    14, 16, 18, 22–23, 25, 28–30, 32, 35, 37, 39–40, 42–43, 45–46, 49, 51–52, 56–57, 59, 64–

6    65, and 67.  Both parties agree that Green's race and sex discrimination claims should be

7    analyzed under the burden-shifting framework established in McDonnell Douglas Corp.

8    v. Green, 411 U.S. 792, 793 (1973).  ECF No. 86 at 17.  The McDonnell Douglas

9    framework has three steps.  The plaintiff must first establish a prima facie case of

10    discrimination.  Merritt v. Old Dominion Freight Line, Inc., 601 F.3d 289, 294 (4th Cir.

11    2010) (citing Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252–53 (1981)).

12    To establish a prima facie case of racial or sex discrimination under Title VII, a

13    plaintiff must show that: 1) she is a member of a protected class, 2) her job performance

14    was satisfactory, 3) she suffered an adverse employment action, and 4) similarly situated

15    employees outside her protected class were treated more favorably, or there is some other

16    evidence giving rise to an inference of unlawful discrimination.  Coleman v. Md. Court

17    of Appeals, 626 F.3d 187, 190 (4th Cir. 2010).  Once the plaintiff establishes a prima

18    facie case, the employer must produce evidence of a legitimate, non-discriminatory

19    reason for employee's adverse employment action.  McDonnell Douglas, 411 U.S. at

20    802.  Finally, if the defendant meets this burden, the plaintiff must then prove that the

21    defendant's proffered reasons "were not its true reasons, but were a pretext for

22    discrimination."  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000).

23    "At this point, the burden to demonstrate pretext merges with the ultimate burden of

1  persuading the court that the plaintiff has been the victim of intentional discrimination."

2  Burdine, 450 U.S. at 256.

3      Where a defendant employer carries its burden to produce evidence of a

4  legitimate, non-discriminatory reason for its actions, "the presumption raised by the

5  prima facie case is rebutted," Burdine, 450 U.S. at 255, and the prima facie case thus "is

6  no longer relevant" and "simply drops out of the picture." St. Mary's Honor Ctr. v.

7  Hicks, 509 U.S. 502, 510–11 (1993).   As the Supreme Court explained in Aikens:

8          Where the defendant has done everything that would be required of him if
9          the plaintiff had properly made out a prima facie case, whether the plaintiff
10         really did so is no longer relevant.  The district court has before it all the
11         evidence it needs to decide whether the defendant intentionally
12         discriminated against the plaintiff.
13
14  U.S. Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 715, (1983) (internal

15  quotation marks omitted).  The Aikens principle applies in the court's

16  McDonnell Douglas analysis at the summary judgment stage.  Feaster v. Fed. Exp. Corp.,

17  2014 WL 4269082, at *8 (D.S.C. Aug. 28, 2014), aff'd, 599 F. App'x 63 (4th Cir. 2015);

18  see also Brady v. Office of Sergeant at Arms, 520 F.3d 490, 494 (D.C. Cir.  2008) ("The

19  Aikens principle applies, moreover, to summary judgment as well as trial proceedings.").

20  The court will examine each of Green's objections through the McDonnell Douglas

21  framework and because of the Aikens principle, the court begins with step two,

22  defendant's production of evidence of a legitimate, non-discriminatory reason for the

23  adverse employment action the employee suffered.  See Feaster, 2014 WL 4269082, at *8

24  (D.S.C. Aug. 28, 2014) ("[If] the employer [can meet] its burden of articulating a

25  legitimate, nondiscriminatory reason for its adverse action against the plaintiff, the Court

13

1    may assume, without deciding, that the plaintiff has established a prima facie case of

2    discrimination.")

3        1. **Legitimate, Non-Discriminatory Reason**

4        Green objects to the R&R's finding that defendant provided a legitimate, non-

5    discriminatory reason for the adverse employment action.  ECF No. 89 at 59–61.

6    Defendant argues that the reason Green was reported to the NPDB is because defendant

7    was required by law to do so after the OMLA Review Panel found that Green rendered

8    substandard care.  ECF No. 91 at 9–10.  Green also objects to the R&R's finding as to

9    what constitutes the adverse employment action in this instance.  Id. at 10–12, 14, 16, 18,

10   22–23, 40, 42–43, 49, 51–52, 56–57.  Because the adverse employment action Green

11   suffered must be identified before the court can make a finding on if the defendant met its

12   burden of providing evidence of a legitimate, non-discriminatory reason for such action

13   occurring, the court must first determine what is the adverse employment action in this

14   instance.

15        a. **Adverse Employment Action**

16        In the R&R, the Magistrate found that the adverse employment action was

17   defendant's reporting of Green to the NPDB and the Board of Nursing.  ECF No. 86 at

18   23.  Green objected to this finding and objected to facts the R&R used to support its

19   conclusion that defendant's reporting of Green to the NPDB and Board of Nursing was

20   the adverse employment action.  ECF No. 89 at 10–12, 14, 16, 18, 22–23, 40, 42–43, 49,

21   51–52, 56–57.  Green contends that the Magistrate's interpretation of Green's complaint,

22   ECF No. 7, is contrary to the law governing pleadings involving Title VII claims.  Id. at

23   57.  Green argues that her complaint "puts the Defendant on notice of . . . the merits of

14

1    the matters and things alleged in her Complaint."  Id. at 58.  Green contends that a proper

2    reading of her complaint put defendant on notice "gravamen of [her] disparate treatment

3    action is that she was unfairly singled out because of her race and/or sex, by way of not

4    being accorded the rights embodied in VHA Handbook 1100.17, Dr. Grippi's February

5    29, 2016 Memorandum, and 38 CFR 46.3(b)" for the proper procedure related to the

6    Post-Payment Medical Malpractice Claim Letter.  Id. at 59.  The court construes this

7    objection as Green arguing that the adverse employment action was defendant's failure to

8    follow the procedures for the Post-Payment Medical Malpractice Claim Letter and not

9    defendant's reporting of Green to the NPDB and Board of Nursing.

10          An adverse employment action is simply "a discriminatory act which adversely

11   affects the terms, conditions, or benefits of the plaintiff's employment."  James v. Booz-

12   Allen & Hamilton, Inc., 368 F.3d 371, 375 (4th Cir. 2004) (internal quotations omitted).

13   The only way a procedural violation could generally relate to a Title VII claim is whether

14   the defendant engaged in an adverse employment action.  Gillaspie v. Spencer, 2020 WL

15   772655, at *5 (D.S.C. Feb. 18, 2020).  However, in order to relate to whether defendant

16   engaged in an adverse employment action Green must have pled facts for the specific

17   procedural violations in her cause of action.  Id. at *6.

18          Federal Rule of Civil Procedure 8(a)(2) "requires only a short and plain statement

19   of the claim showing that the pleader is entitled to relief, in order to give the defendant

20   fair notice of what the . . . claim is and the grounds upon which it rests."  Bell Atl. Corp.

21   v. Twombly, 550 U.S. 544, 555 (2007) (internal quotation marks and citation omitted)

22   (emphasis added).  While Green is not required to plead facts sufficient to prove her case

23   as an evidentiary matter in the complaint, she must allege facts that support a claim for

1    relief.  Bass v. Dupont, 324 F.3d 761, 765 (4th Cir. 2003) (emphasis added).  The

2    complaint must "contain a modicum of factual specificity, identifying the particular

3    conduct of defendants that is alleged to have harmed the plaintiff."  Smith v. Pepsi

4    Bottling Grp., Inc., 2009 WL 2982872, at *4 (D.S.C. Aug. 20, 2009) (emphasis added).

5    To be sure, Green's complaint sufficiently alleges a claim against defendant for being

6    reported to the NPDB and the Board of Nursing, and for the procedure regarding the Pre-

7    Payment Letter.  ECF No. 7.  However, there is not one reference to the Post-Payment

8    Medical Malpractice Claim Letter in Green's complaint.  Because Green failed to allege

9    that defendant's decision to report her to the NPBD was based on procedural violations of

10   the Post-Payment Medical Malpractice Claim Letter in her complaint, Green cannot

11   argue at this stage in the proceedings that such an alleged violation is the adverse

12   employment action in this instance.[2]  See Gillaspie v. Spencer, 2020 WL 772655, at *5

13   (holding that procedures used by the employer in taking an adverse employment action

14   that are not plead have no bearing on the elements of Title VII causes of action); see also

15   McCleary-Evans v. Maryland Dep't of Transp., State Highway Admin., 780 F.3d 582,

16   585–86 (4th Cir. 2015).

---

[2]  Although Green cannot argue alleged procedural violations of the Post-Payment Medical Malpractice Claim Letter were the adverse employment action in this instance because of her insufficient pleading, the court may still consider this argument as evidence during the "pretext" step of the McDonnell Douglass framework.  See Reeves, 530 U.S. at 143 (holding that if question comes down to "pretext" in a McDonnell Douglass framework analysis, a plaintiff "must be afforded the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.").

1    Therefore, the court overrules Green's objections disputing the adverse

2    employment action in this instance, affirms the R&R, and finds the adverse employment

3    action is defendant's reporting of Green to the NPDB and Board of Nursing.

4              **b.  Plaintiff's Burden**

5    Having found that the adverse employment action in this instance is defendant's

6    reporting of Green to the NPDB and Board of Nursing, the court now turns its attention

7    to whether defendant has produced sufficient evidence of a legitimate, nondiscriminatory

8    reason for the adverse employment action.  In the R&R, the Magistrate found that

9    defendant met its burden of providing a legitimate, nondiscriminatory reason for the

10   adverse employment action.  ECF No. 86 at 23.  Green objects to the R&R's finding that

11   defendant provided a legitimate, non-discriminatory reason for the adverse employment

12   action.  ECF No. 89 at 59–61.  Green argues that the R&R should not have concluded

13   that defendant met its burden because "ample evidence" demonstrates that defendant's

14   decision to report Green was not based on legitimate, non-discriminatory reason.  Id.

15   Green argument misstates the defendant's burden at step two of the McDonnell Douglas

16   framework.

17   In step two of the McDonnell Douglas framework, the burden is on the defendant

18   to produce evidence that the adverse employment action was for a legitimate,

19   nondiscriminatory reason.  Burdine, 450 U.S. at 254.  The defendant need not persuade

20   the court that it was actually motivated by the proffered reasons.  Id.  It is sufficient if the

21   defendant's evidence raises a genuine issue of fact as to whether it discriminated against

22   the plaintiff.  Id.  To accomplish this, the defendant must clearly set forth, through the

23   introduction of admissible evidence, the reasons for the plaintiff's adverse employment

1    action.  Id. at 255.  The explanation provided must be legally sufficient to justify a

2    judgment for the defendant.  Id.

3         Defendant explains that it was required by law for the OMLA to review every

4    paid medical malpractice claim and to file a report to the NPDB and local boards if the

5    OMLA Review Panel finds that a payment was related to substandard care.  ECF No. 91

6    at 9.  Defendant argues that because the OMLA Review Panels concluded that Green

7    rendered substandard care, defendant was legally obligated to report Green to the NPDB

8    and to the South Carolina Board of Nursing.  Id. (citing 42 U.S.C. §§ 11131(a),

9    11134(c)(1); 38 C.F.R. § 46.3; 45 C.F.R. § 60.7).  This evidence is sufficient for

10   defendant to meet its the burden required in step two of the McDonnell Douglas

11   framework and shift the burden back to Green.  It is inappropriate for the court to

12   consider defendant's argument that there is evidence that defendant's decision to report

13   Green was not based on legitimate, non-discriminatory reason during this step in the

14   McDonnell Douglas framework.  It is proper for the court to review such evidence in the

15   third step, or "pretext" step of the McDonnell Douglas framework, as the Magistrate did

16   in the R&R.  ECF No. 86 at 24–28.

17        Therefore, the court overrules Green's objections disputing that defendant

18   provided a legitimate, non-discriminatory reason for the adverse employment action,

19   affirms the R&R to that end, and finds defendant met its burden in producing evidence of

20   a legitimate, non-discriminatory reason for the adverse employment action.

21        **2.  Pretext**

22        Having found that defendant met its burden in producing evidence of a legitimate,

23   non-discriminatory reason for the adverse employment action, the court now turns its

1    attention to third step, or "pretext" step of the <u>McDonnell Douglas</u> framework.  In the

2    R&R, the Magistrate found that "the evidence in the record was insufficient to permit a

3    reasonable jury to conclude that the defendant's stated reason for reporting [Green] to the

4    NPBD and State Board of Nursing was pretext for race and/or sex discrimination."  ECF

5    No. 86 at 29.  Green objects to this finding, and to several other factual findings made in

6    the R&R that Green argues should have be considered sufficient evidence of pretext.

7    ECF No. 89 at 10–12, 14–15, 18, 22–23, 42–43, 49, 51–52, 56, 65, 67.

8         Where a defendant employer carries its burden to produce evidence of a

9    legitimate, non-discriminatory reason for its actions, "the presumption raised by

10    the <u>prima facie</u> case is rebutted," <u>Burdine</u>, 450 U.S. at 255, and the <u>prima facie</u> case thus

11    "is no longer relevant" and "simply drops out of the picture."  <u>St. Mary's Honor Ctr. v.</u>

12    <u>Hicks</u>, 509 U.S. 502, 510–11 (1993).  In this third step, the question the court must

13    answer becomes whether the plaintiff can demonstrate that the employer's stated reason

14    is pretextual, which requires the plaintiff "to prove '<u>both</u> that the reason was

15    false, <u>and</u> that discrimination was the real reason.'"  <u>Adams v. Trs. of the Univ. of N.C.-</u>

16    <u>Wilmington</u>, 640 F.3d 550, 560 (4th Cir. 2011) (quoting <u>Jiminez v. Mary Washington</u>

17    <u>Coll.</u>, 57 F.3d 369, 378 (4th Cir. 1995)) (emphasis in original).  "A plaintiff could

18    accomplish this goal 'by showing that the employer's proffered explanation is unworthy

19    of credence.'"  <u>Holland v. Washington Homes, Inc.</u>, 487 F.3d 208, 214 (4th Cir. 2007)

20    (quoting <u>Burdine</u>, 450 U.S. at 256).  The plaintiff "must be afforded the opportunity to

21    prove by a preponderance of the evidence that the legitimate reasons offered by the

22    defendant were not its true reasons, but were a pretext for discrimination."  <u>Reeves</u>, 530

1    U.S. at 143.  The court's analysis, however, requires more than a simple determination of

2    whether an employer's proffered reasons for the adverse employment action are specious.

> 3    The ultimate question is whether the employer intentionally discriminated,
> 4    and proof that the employer's proffered reason is unpersuasive, or even
> 5    obviously contrived, does not necessarily establish that the plaintiff's
> 6    proffered reason is correct.  In other words, it is not enough to <u>dis</u>believe
> 7    the employer; the factfinder must <u>believe</u> the plaintiff's explanation of
> 8    intentional discrimination.

10    <u>Reeves</u>, 530 U.S. at 146–47 (quotations omitted) (emphasis in original).  Thus, "[c]ourts

11    must . . . resist the temptation to become so entwined in the intricacies of the <u>McDonnell</u>

12    <u>Douglas</u> proof scheme that they forget that the scheme exists solely to facilitate

13    determination of 'the ultimate question of discrimination <u>vel non</u>.'"  <u>Merritt v. Old</u>

14    <u>Dominion Freight Line, Inc.</u>, 601 F.3d 289, 295 (4th Cir. 2010) (quoting <u>Proud v.</u>

15    <u>Stone</u>, 945 F.2d 796, 798 (4th Cir.1991)).

16    The crux of Green's argument that defendant's stated reason for reporting her to

17    the NPBD and Nursing Board is pretext for a discriminatory motive is based on alleged

18    procedural malfeasance by defendant in notifying Green of the Post-Payment Medical

19    Malpractice Claim Letter.  ECF No. 89 at 65 ("The heart of [Green]'s case is that

20    [defendant] did not follow mandatory edicts to allow the [Green] to be notified of the

21    [Post-Payment] Medical Malpractice [Claim] [L]etter.").  Green focuses the majority of

22    her pretext argument objecting to any findings the R&R made that defendant did not

23    violate the notification procedure of the Post-Payment Medical Malpractice Claim Letter.

24    <u>Id.</u> at 11–12, 14, 16, 22–23, 42–43, 49, 51–52, 56, 65, 67.  Green relies on the Seventh

25    Circuit opinion, <u>Skiba v. Illinois Central Railroad Co.</u>, to contend that this violation of

26    procedure is evidence of discriminatory intent.  884 F.3d 708, 722 (7th Cir. 2018).  The

27    court is not bound by the decision in <u>Skiba.</u>  Even if the court were bound by <u>Skiba</u>, the

1    facts in this instance are insufficient to provide evidence of discriminatory intent.  In

2    Skiba, deviations from established policies can be "probative circumstantial evidence of

3    discriminatory intent" only if such deviations are "[s]ignificant, unexplained or

4    systematic."  Skiba, 884 F.3d at 722.  In this instance, even assuming defendant did

5    violate the established policy notification procedure of the Post-Payment Medical

6    Malpractice Claim Letter, that deviation is neither significant, unexplained, or systematic.

7         Green was e-mailed the notice of the Post-Payment Medical Malpractice Claim

8    Letter.  ECF No. 66-5 at 1–3.  Regardless of whether that violated the established policy

9    notification procedure of the Post-Payment Medical Malpractice Claim Letter, the court

10   does not find that mailing a letter to an individual's last known address and e-mailing a

11   letter to an individual's last known e-mail address is a significant deviation.

12        Additionally, Camille Bratek, an attorney with the OMLA, stated in her

13   deposition that in her opinion the OMLA allows facilities to send notifications of claims

14   like the Post-Payment Medical Malpractice Claim Letter over email.  ECF No. 66-13 at

15   2.  The court finds that to be a sufficient and plausible explanation.  Finally, Green offers

16   no evidence that e-mailing a notice letter is a systematic deviation.  To the contrary,

17   Green admits that defendant hand-delivered the notice of the Pre-Payment Letter.  ECF

18   No. 65-1 at 6 (citing ECF No. 65-21).  In short, even if the court were bound by the

19   standard set forth in Skiba that deviations from established policies can be "probative

20   circumstantial evidence of discriminatory intent", Green fails to meet this standard

21   because such deviations were not significant, unexplained, or systematic.

22        Green also contends that Camille Bratek's statement that the OMLA allows

23   facilities to send notifications of claims like the Post-Payment Medical Malpractice

1   Claim Letter over email is evidence of an inconsistent explanation of why Green was

2   given notice of the Post-Payment Medical Malpractice Claim Letter via email.  ECF No.

3   89 at 55.  Green relies on E.E.O.C. v. Sears Roebuck to argue that such inconsistency is

4   probative of pretext.  243 F.3d 846, 852–53 (4th Cir. 2001).  Id.; see also Basham v.

5   Select Specialty Hosp., 2017 WL 2385348, at *10 (S.D.W. Va. June 1, 2017)

6   ("[W]eaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the

7   employer's proffer can give rise to an inference of pretext.") (quoting Harrington v.

8   Aggregate Indus. Ne. Region, Inc., 668 F.3d 25, 33 (1st Cir. 2012)).  The opinion in

9   E.E.O.C. v. Sears Roebuck holds that in order for the inconsistency to be probative of

10   pretext, it must lack consistency in explaining the adverse employment action.  243 F.3d

11   at 852–53.  As the court has already stated, the adverse employment action in this

12   instance was reporting Green to the NPBD and Nursing Board, not the alleged improper

13   notification of the Post-Payment Medical Malpractice Claim Letter.  Even still, Green

14   fails to point out evidence of inconsistency in explanations for why she was e-mailed the

15   Post-Payment Medical Malpractice Claim Letter.  Green offers deposition testimony

16   from Sandra All, Dr. Grippi, and Melissa Harrelson, each of whom state that e-mailing

17   notification to a provider was not listed as an acceptable method in any of the regulations.

18   Id. at 49–54.  However, Green provides no testimony that addresses whether providing

19   notice to practitioners via e-mail never occurred as a matter of practice nor did Green

20   provide any evidence of any other explanations of why defendant provided Green

21   notification via e-mail.  Green attempts to conflate the deviations from the regulations

22   that governed the Post-Payment Medical Claim Letter as an inconsistency in explanations

23   as to why she was e-mailed the Post-Payment Medical Malpractice Claim Letter.  Such

1    conflation does not demonstrate defendant's proffered explanation was a falsity or

2    inconsistent. The court is unpersuaded by this argument.

3         Green also objects to the R&R's findings by arguing that the Magistrate did not

4    properly consider defendant's past discriminatory conduct against minority employees.

5    ECF No. 89 at 67. Green presented evidence of discriminatory hiring practices by Mary

6    Fraggos. ECF Nos. 83-42 at 2–9; 83-48 at 2–6; 83-44 at 1–6; 83-45 at 1–2; 83-46 at 2;

7    83-47 at 2. Green argues that the Magistrate's reliance on Holley v. N.C. Dep't of

8    Admin., N.C., 846 F. Supp.2d 416, 433–34 (E.D.N.C. 2012), when considering Mary

9    Fraggos's past discriminatory conduct was misplaced, and instead the Magistrate should

10   have focused his analysis on the First Circuit opinion, Conway v. Electro Switch

11   Corporation, 825 F.2d, 593, 597 (1st Cir. 1987), and the Eleventh Circuit opinion,

12   Goldsmith v. Bagby Elevator Co. Inc., 513 F.3d 1261, 1285-86 (11th Cir. 2008). Id. at

13   67–69. The court disagrees with Green's assertion.

14        While none of the three decisions above are binding on the court, Holley relies on

15   the Supreme Court decision Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002).

16   In Morgan, the Supreme Court held that sworn statements concerning past instances of

17   racial discrimination "may constitute relevant background evidence in a proceeding in

18   which the status of a current [incident] is at issue[,]" but those statements are limited. Id.

19   at 120–121 (quotation omitted). Specifically, Morgan held that the court must examine

20   whether the "pre-and post-limitations period incidents involve the same type of

21   employment actions, occurred relatively frequently, and were perpetrated by the same

22   managers." Id. at 120 (quotation omitted) (alteration in original) (emphasis added). In

23   this instance, the type of employment actions involved in the discrimination evidence

1    Green presented was based on hiring; it was not based on being reported to the NPBD or

2    Nursing Board or even the procedures, including the notification process, surrounding

3    such reporting.  ECF Nos. 83-42 at 2–9; 83-48 at 2–6; 83-44 at 1–6; 83-45 at 1–2; 83-46

4    at 2; 83-47 at 2.  Additionally, Green failed to provide the court with any evidence that

5    Mary Fraggos was involved in any way with Green being identified as a practitioner for

6    the patient, administering the procedures involving the Post-Payment Medical

7    Malpractice Claim Letter, the Review Panel's finding that Green rendered substandard

8    care to the patient, or defendant reporting Green to the NPBD or Nursing Board.  In

9    short, the evidence that Green provided to show that defendant's discriminatory history is

10   insufficient to demonstrate pretext.

11           Assuming the court accepts as true all of Green's objections to the R&R involving

12   the Post-Payment Medical Claim Letter and the all of Green's allegations surrounding the

13   Post-Payment Medical Claim Letter: that VAMC singled out Green and Dr. Brame as the

14   only two practitioners involved in the care that led to the Patient Settlement even though

15   there were other females and African-Americans involved in that care, that Green was

16   then not provided notice of the Post-Payment Medical Claim Letter by methods allowable

17   under the regulations and Dr. Brame, a male Caucasian, was[3], that Green was not given

18   the right to submit a statement within sixty days of the first Review Panel, and that Green

19   was then not allowed to review the patient's medical records and Dr. Brame was[4] when

20   she submitted her statement to the second Review Panel, Green has still not provided any

---

[3] There is no evidence that Dr. Brame was provided the Post-Payment Medical Claim
Letter other than by e-mail.

[4] There is no evidence that Dr. Brame was provided the patient's medical records.

1    evidence that this treatment was based on discrimination, other than her subjective

2    beliefs.  "[S]ubjective belief . . . without more, is insufficient to create a genuine issue of

3    material fact as to any discriminatory conduct. . . ."  Bryant v. Bell Atl. Maryland, Inc.,

4    288 F.3d 124, 135 (4th Cir. 2002).

5            Furthermore, Green must "prove both that the reason was false, and that

6    discrimination was the real reason" to demonstrate that defendant's stated reason is

7    pretextual.  Adams, 640 F.3d at 560 (internal quotation omitted).  Even assuming that

8    Green proved defendant's given reason was false, there is nothing in the record to show

9    that the real reason was discrimination.  For defendant's real reason to be discrimination

10   the court would have to believe that because of Green's race and gender defendant took

11   all of the above-mentioned actions, and that those actions would necessarily lead to two

12   independent Review Panels, who did not know of Green's race or sex prior to convening,

13   finding that Green rendered substandard care to the patient, which would require Green to

14   be reported to the NPBD and Nursing Board.  The evidence presented by Green is simply

15   too tenuous for the court to believe this.

16           Therefore, the court overrules Green's objections that defendant's articulated

17   reason for the adverse employment action was pretextual, affirms the R&R, and finds that

18   Green failed to prove by the preponderance of the evidence that defendant's stated reason

19   for the adverse employment action was pretext for discriminatory intent.  Having found

20   that defendant's stated reason for the adverse employment action was not pretext, the

1    court overrules Green's objections, affirms the R&R, and grants defendant's motion for

2    summary judgment as to all counts of Green's complaint.[5]

3                              **IV.   CONCLUSION**

4           For the foregoing reasons, the court ADOPTS the R&R, DENIES Green's

5    amended motion for partial summary judgment, and GRANTS defendant's motion for

6    summary judgment.

7    **AND IT IS SO ORDERED.**
8

9
10                            _____
                             **DAVID C. NORTON**
11                            **UNITED STATES DISTRICT JUDGE**
12
13   **May 11, 2020**
14   **Charleston, South Carolina**

15

---

5   Because the court finds that defendant has done everything that would be required if the Green had properly made out a <u>prima facie</u> case, the court need not examine Green's objections relating to her <u>prima facie</u> case because such analysis is now irrelevant to the court's finding.  <u>Aikens</u>, 460 U.S. at 715 ("Where the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case, whether the plaintiff really did so is no longer relevant.").